[Sac. No. 7860. In Bank. May 10, 1971.]

LEONARD VASQUEZ et al., Petitioners, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
RICHARD B. KARP et al., Real Parties in Interest.

**COUNSEL**

Kelley, Livingston, Zavala, Neumark, Lowenstein & Mattison, John P. Kelley and Rushing & Clark for Petitioners.

Thomas C. Lynch, Attorney General, Charles A. O'Brien, Chief Deputy Attorney General, Herschel T. Elkins, Herbert Davis, Walter White and

Andrea Sheridan Ordin, Deputy Attorneys General, Marvin S. Kayne, Stephen Shefler, Stephen J. Herzberg, Roger Jon Diamond, William F. McCabe and William D. Warren as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Severson, Werson, Berke & Melchior, Bernardus J. Smit, Cavalero, Dietrich & Bray, Sheppard, Mullin, Richter & Hampton and William A. Masterson for Real Parties in Interest.

Styskal, Wiese & Colman, Alvin O. Wiese, Jr., Latham & Watkins, Philip F. Belleville and David C. Wright as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**MOSK, J.**—We consider whether a group of consumers who have bought merchandise under installment contracts may maintain a class action seeking rescission of the contracts for fraudulent misrepresentation on behalf of themselves and others similarly situated, against both the seller of a product and the finance company to which the installment contracts were assigned. We conclude that such an action will lie against the seller under the principles set forth in *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732], and that the assignee of the contract is a proper party to such an action under the circumstances presented here.

The action was brought by 37 named plaintiffs on behalf of themselves as well as others who are residents of San Joaquin and Stanislaus Counties and who purchased frozen food and freezers from Bay Area Meat Company. They each executed two retail installment sales contracts to finance the purchases, one in payment of the food, and the other for the freezer, and a binder contract. These contracts were assigned by Bay Area to three finance companies, Avco Thrift, Sterling Finance Corporation, and Beneficial Finance Company of Turlock, which were also named as defendants.[1] Defendants demurred to the complaint on the ground that it did not state a cause of action, and the demurrers were sustained without leave to amend insofar as the complaint alleged a class action for fraud

---

[1] For literary convenience, defendants in the trial court who are real parties in interest will be referred to hereinafter either as defendants or as Bay Area, Avco, Sterling, or Beneficial. The reference to "plaintiffs," who are petitioners in this proceeding, will, unless otherwise stated, refer collectively to both the named plaintiffs and the unnamed class members.

but were overruled on the fraud count as to the named plaintiffs. A second cause of action, also alleged as a class action, charged violation of the Unruh Act (Civ. Code, § 1801 et seq.) in that the installment contracts failed to meet the requirements of that act. The demurrers of all defendants were overruled as to the second cause of action.

In upholding the demurrers to the class action aspect of the fraud count, the trial court made it clear that it was not concerned with the sufficiency of the particular allegations to assert a class action but, rather, that in its view a class action for fraud may not be maintained by consumers.[2]

Plaintiffs seek a writ of mandate to compel the trial court to vacate its order sustaining the demurrers to the first cause of action as a class action and to order the court to allow them to proceed to try the cause of action for fraud as a class action.

I

We are met at the threshold with a contention of defendants that mandate is an inappropriate remedy because plaintiffs have an adequate remedy by appeal. It seems clear, however, that plaintiffs may not appeal from the trial court's judgment dismissing their first cause of action as a class action[3] because such a course would violate the rule that an appeal may be taken only from a final judgment. (Code Civ. Proc., § 963, subd. 1.) Under this principle an appeal may not be taken from a judgment which disposes of less than all the causes of action between the parties. (See, e.g., *Bank of America* v. *Superior Court* (1942) 20 Cal.2d 697, 701 [128 P.2d 357]; *Mather* v. *Mather* (1936) 5 Cal.2d 617, 618 [55 P.2d 1174].)

The complaint here seeks rescission of the contracts on the theory of fraud in the first cause of action and on the theory of a violation of the Unruh Act in the second cause of action. ▆ *Mather* refused to allow piecemeal disposition of a cause, and determines that where, as here, all the causes of action set forth in the complaint have a single

---

[2]After analyzing some California cases on the subject of class actions, the court stated in its ruling that many state decisions appear to have been unsympathetic to consumer class actions, that these cases may be outmoded and class actions may be permitted, but that appellate courts are better suited to decide this question than a trial court.

[3]The judgment of dismissal was entered by the trial court after plaintiffs had filed their petition for a writ of mandate in the Court of Appeal.

object, an appeal will not be permitted from a judgment disposing of only one count of the complaint.[4]

We conclude, therefore, that since plaintiffs cannot appeal from the order which bars a substantial portion of their cause from being heard on the merits, their petition for a writ of mandate deserves consideration.

## II

Thirty years ago commentators, in urging the utility of the class suit to vindicate the rights of stockholders, made this incisive observation: "Modern society seems increasingly to expose men to . . . group injuries for which individually they are in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive. If each is left to assert his rights alone if and when he can, there will at best be a random and fragmentary enforcement, if there is any at all. This result is not only unfortunate in the particular case, but it will operate seriously to impair the deterrent effect of the sanctions which underlie much contemporary law. The problem of fashioning an effective and inclusive group remedy is thus a major one." (Kalven and Rosenfield, *Function of Class Suit* (1941) 8 U.Chi.L.Rev. 684, 686.)

What was noteworthy in the milieu three decades ago for stockholders is of far greater significance today for consumers. Not only have the means of communication improved and the sophistication of promotional and selling techniques sharpened in the intervening years, but consumers as a category are generally in a less favorable position than stockholders to secure legal redress for wrongs committed against them. For these reasons, the desirability of consumers suing as a class for fraud or other improper conduct of predatory sellers has been the topic of much thoughtful analysis in recent years. Numerous commentators have urged adaptation of class proceedings to consumer frauds. (See, e.g., Starrs, *The Consumer Class Action* (1969) 49 B.U.L.Rev. 211-250, 407-513; Eckhardt,

---

[4]Neither our holding in *Daar* nor the provisions of section 581, subdivision 3, of the Code of Civil Procedure are contrary to this conclusion. We held in *Daar* that an order of the trial court sustaining a demurrer to a complaint as a class action was appealable even though it was not embodied in a formal judgment, but the order appealed from there sustained a demurrer as to both causes of action alleged in the complaint. Here the trial court has sustained demurrers to the class action allegations of the first cause of action but overruled demurrers to the second cause alleging a class action for rescission because of the violation of the Unruh Act. Section 581, subdivision 3, merely states that the trial court may dismiss an action after sustaining a demurrer without leave to amend. It does not purport to affect the question whether the order of dismissal is appealable if it does not dispose of all the issues between the parties.

*Consumer Class Actions* (1970) 45 Notre Dame Law. 663; Goldhammer, *The Consumer Class Action in California* (1970) 45 L.A.Bar Bull. 235.)

Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society. According to the report of the Kerner Commission, many persons who reside in low income neighborhoods experience grievous exploitation by vendors using such devices as high pressure salesmanship, bait advertising, misrepresentation of prices, exorbitant prices and credit charges, and sale of shoddy merchandise. State laws governing relations between consumers and merchants are generally utilized only by informed, sophisticated parties, affording little practical protection to low income families. (Report of National Advisory Commission on Civil Disorders (Bantam ed. 1968) pp. 275-276; Hester, *Deceptive Sales Practices and Form Contracts—Does the Consumer Have a Private Remedy?* (1968) Duke L.J. 831.) The alternatives of multiple litigation (joinder, intervention, consolidation, the test case) do not sufficiently protect the consumer's rights because these devices "presuppose 'a group of economically powerful parties who are obviously able and willing to take care of their own interests individually through individual suits or individual decisions about joinder or intervention.' " (*Dolgow* v. *Anderson* (E.D.N.Y. 1968) 43 F.R.D. 472, 484.)

Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial.

In California, we do not lack authority on the subject of the amenability of consumer claims to class action litigation. Section 382 of the Code of Civil Procedure provides, ". . . when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." In the leading case of *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, we held that an individual plaintiff may under this section bring a class action on his

own behalf and on behalf of other taxicab riders similarly situated to recover overcharges allegedly made by defendant company. *Daar* did not, like the present case, involve purported fraudulent misrepresentations, but the principles set forth there guide us in determining whether the class action mechanism is an appropriate vehicle to resolve a claim based upon such misrepresentations.

The class in *Daar* consisted of several thousand taxicab riders. Plaintiff sought to recover as damages the illegal overcharges received by defendant cab company from riders over the four years immediately preceding the commencement of the action. It was alleged that proof of a common or single state of facts and law would establish the right of each member of the class to recover, that the percentage of rate overcharge to each class member was identical, and that the amount of the overcharge could be calculated from defendant's books. In reversing the trial court's judgment based on sustaining a demurrer to the complaint, we concluded that two requirements must be met to sustain a class action. ■ The first is existence of an ascertainable class, and the second is a well-defined community of interest in the questions of law and fact involved.

■ As to the necessity for an ascertainable class, the right of each individual to recover may not be based on a separate set of facts applicable only to him.[5]

The requirement of a community of interest does not depend upon an identical recovery, and the fact that each member of the class must prove his separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper. ■ The mere fact that separate transactions are involved does not of itself preclude a finding of the requisite community of interest so long as every member of the alleged class would not be required to litigate numerous and substantial questions to determine his individual right to recover subsequent to the rendering of any class judgment which determined in plaintiffs' favor whatever questions were common to the class.

---

[5]*Daar* involved the question of identification of class members, an issue which, as we shall see, presents no serious obstacle to the maintenance of a class action here. In *Daar* it was held that the fact that individual taxicab riders could not be identified at the time the action was brought was not significant because a complete determination of the issues affecting the class (i.e., such as whether there was an overcharge and the total amount thereof) could be made without identification and without the appearance of the individual class members. An accounting could determine the total of the overcharges, we stated, and after the questions relating to the alleged impropriety of the charge and the total amount of the overcharge had been determined, each class member could come forward to prove his own separate damages.

■ Substantial benefits both to the litigants and to the court should be found before the imposition of a judgment binding on absent parties can be justified, and the determination of the question whether a class action is appropriate will depend upon whether the common questions are sufficiently pervasive to permit adjudication in a class action rather than in a multiplicity of suits.

In applying these principles to the facts alleged in *Daar*, we concluded that the issues which were common among the class members would be the principal issues in any individual action, both in terms of time to be expended in their proof and of their importance, and that if a class suit were not permitted, a multiplicity of legal actions dealing with identical basic issues would be required in order to permit recovery by each of several thousand taxicab riders. The result would be manifold burdens on the parties and on the judicial process. Furthermore, efforts to seek recovery by an individual taxicab user would be unlikely as there was a relatively small loss to each class member and separate actions would not be economically feasible. Absent a class suit, a wrongdoing defendant would retain the benefits of its wrongs.

## III

### Sufficiency of the Allegations to State a Class Action

With these principles in mind, we turn to the allegations of the complaint which seeks to rescind the contracts on the ground that plaintiffs were induced to execute the instruments by the fraudulent representations of Bay Area. The complaint alleges that the same representations regarding the food and the freezers were made to each plaintiff, that Bay Area knew the representations were false, that they were made with intent to defraud, and that plaintiffs signed the agreements in reliance thereon. It is further alleged that plaintiffs are united in interest in that, inter alia, they have all signed contracts to purchase food and a freezer in reliance upon the misrepresentations, which in turn were based upon recitations by salesmen of a standard sales monologue contained in a training book and sales manual. Proof of a common state of facts, it is alleged, will establish the right of each class member to rescind his contract.

### 1. Ascertainability of the Class

■ The first requisite for maintenance of a class action, ascertainability of the class, presents no serious obstacle in this case. The complaint alleges that the members of the class are all those who have signed installment contracts with Bay Area for the purchase of meat and a freezer

after January 1, 1966, who reside in Stanislaus or San Joaquin Counties, and who have paid or are obligated to pay money on the contracts to one of the defendants. It appears that there are approximately 200 persons in the class. Furthermore, it is alleged, the names and addresses of the class members may be ascertained from defendants' books.

### 2. Community of Interest

We next ascertain whether there are issues common to the class as a whole sufficient in importance so that their adjudication on a class basis will benefit both the litigants and the court. In this evaluation the mere fact that the transaction between Bay Area and each plaintiff was separately consummated is not determinative so long as each class member will not be required to litigate numerous and substantial issues to establish his individual right to recover.

In order to prevail plaintiffs must show that Bay Area made false representations with knowledge of their falsity, that these representations were made with intent to and did induce reasonable reliance by plaintiffs, and that plaintiffs suffered damages as a result. (*Ach* v. *Finkelstein* (1968) 264 Cal.App.2d 667, 674 [70 Cal.Rptr. 472].) Defendants assert that none of these elements may be proved by the device of a class action because each plaintiff entered into a separate transaction at a different time and proof of the fact of representation, its falsity, and reliance as to the named plaintiffs will not supply proof of these elements as to the absent members of the class. Thus, it is asserted, each member of the class must establish his right to recover on the basis of facts peculiar to his own circumstances, because of which the action may not be tried as a class suit.

### a. The Representations

The representations conveniently fall into two categories: those concerning the contract for the purchase of the freezer and those relating to the frozen food contract. We examine them separately.

Plaintiffs allege that Bay Area's salesmen represented to each member of the class that the freezers were of high quality and guaranteed for a lifetime, and that they were sold at a reasonable retail price.[6] It is asserted by plaintiffs that they can demonstrate these representations were in fact made to each class member without individual testimony because the salesmen employed by Bay Area memorized a standard statement

---

[6]We do not discuss whether the allegations are sufficient to state a cause of action for fraud. The trial court has concluded that the complaint is sufficient in this regard in overruling defendants' demurrers insofar as the named plaintiffs are concerned.

containing the representations (which in turn were based on a printed narrative and sales manual) and that this statement was recited by rote to every member of the class. The demurrers must be deemed to admit these facts.[7] If plaintiffs can prove their allegations at the trial, an inference that the representations were made to each class member would arise, in which case it would be unnecessary to elicit the testimony of each plaintiff as to whether the representations were in fact made to him.

It is also alleged that the representations regarding the freezers were false, and that the prices charged for them were exorbitant, excessive and unconscionable, amounting to not less than twice the reasonable retail price. The falsity of these representations could be shown on a common basis since proof of the allegations regarding the quality and price of the freezers purchased by the named plaintiffs would provide proof as to all. Although it appears that not every member of the class purchased the same brand and model of freezer, it is likely that all the brands and models are represented among the 37 named plaintiffs and to the extent that this is not so evidence may be introduced to cure the omission.

We turn next to the alleged misrepresentations regarding the frozen food purchased by plaintiffs. It is averred that Bay Area salesmen represented to each class member that the food orders were sold at a wholesale rate, that each order would last a minimum of seven months, and that the total cost of a "seven-month" food order and a freezer would be less than the amount plaintiffs were spending each month for similar food at retail stores.

According to the allegations, a common sales recitation was also employed in the sale of the frozen food and, for the reasons discussed above regarding the freezer contracts, we assume for the present that these representations were in fact made to each plaintiff.

As to the falsity of the representations, we perceive no singular difficulty in proving on a common basis whether the food supplied by Bay Area was sold at wholesale rates. Defendants insist, however, that it would be impossible without the individual testimony of each plaintiff to demonstrate the falsity of the alleged representations that the supply of food would last for seven months. It is argued that each plaintiff must have given an estimate of his consumption to the salesman, that the accuracy of this estimate as well as the salesman's calculation of the amount of food required for a seven-month supply would vary in each case, and

---

[7]Defendants deny in their briefs that there was a standard sales manual and they assert that the recital did not contain the alleged misrepresentations. These are factual matters for determination by the trial court.

that individual proof of consumption of each plaintiff's family during the period would be required.

This contention is unpersuasive at the pleading stage of the proceedings because we cannot assume that plaintiffs will be unable to establish their allegations without the separate testimony of each class member; at least they must be afforded the opportunity to show that they can prove their allegations on a common basis. An examination of the contracts attached to the complaint indicates that Bay Area sold varying quantities of food to the several plaintiffs, but that each order was of a standard type. Thus, for example, customers who purchased Pack F received 119 pounds of beef and 123 pounds of assorted variety meats, vegetables, and fruit juices. Each type of food pack had a standard price.

The existence of these standard orders raises at least a rebuttable implication that the salesmen utilized a defined formula to determine the amount of food a particular family would need for a specified period of time. Whether this formula related to the size of the family, the amount the family spent for food each month[8] or a combination of factors, is not clear. If a formula was in fact utilized the alleged falsity of the representation regarding the length of time a food order would suffice can be demonstrated by proof of such factors as the average monthly consumption of food for a family of a particular size.

The final allegation of misrepresentation with regard to the frozen food is that Bay Area salesmen told plaintiffs the total cost of a "seven-month" food order and a freezer would be less than the amount each plaintiff was spending every month on food at retail stores. The thrust of this allegation is that it was represented the price differential between the cost of the food purchased from Bay Area and its retail value elsewhere would be adequate to pay for the freezers purchased by plaintiffs. It appears from what has been said above that this allegation, too, may be amenable to proof on a common basis.

There may be other methods by which plaintiffs can establish the alleged falsity of the representations regarding the food orders for the class as a whole. For the purpose of determining if the demurrers should have been overruled, it is sufficient that there is a reasonable possibility plaintiffs can establish a prima facie community of interest among the class members on the false representation issue. Plaintiffs' inability to do so, if that be the ultimate result, can be determined at a later stage of the proceeding.

[8]There is some indication in the record that salesmen asked prospective customers the amounts they spent on food each month and that this amount was written down in the course of the sale.

## b. *Reliance*

The next element which plaintiffs must prove in order to prevail is reliance upon the alleged misrepresentations. If they can establish without individual testimony that the representations were made to each plaintiff and that they were false, it should not be unduly complicated to sustain their burden of proving reliance thereon as a common element.

■ The rule in this state and elsewhere is that it is not necessary to show reliance upon false representations by direct evidence. "The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect." (*Hunter* v. *McKenzie* (1925) 197 Cal. 176, 185 [239 P. 1090]; *Gormly* v. *Dickinson* (1960) 178 Cal.App.2d 92, 105 [2 Cal.Rptr. 650]; *Thomas* v. *Hawkins* (1950) 96 Cal.App.2d 377, 380 [215 P.2d 495]; *Mathewson* v. *Naylor* (1937) 18 Cal.App.2d 741, 744 [64 P.2d 979]; see *Bank of St. Helena* v. *Lilienthal-Brayton Co.* (1928) 89 Cal.App. 258, 262 [264 P. 546]; 12 Williston on Contracts (3d ed. 1970) p. 480.)

Williston speaks in terms of a presumption: "Where representations have been made in regard to a material matter and action has been taken, in the absence of evidence showing the contrary, it will be presumed that the representations were relied on." (12 Williston on Contracts (3d ed. 1970) 480.) This rule is in accord with the Restatement. (Rest., Contracts, § 479, illus. 1.) Whether an inference (as held in *Hunter* v. *McKenzie, supra,* 197 Cal. 176, 185) or a presumption (as described by Williston and the Restatement) of reliance arises upon proof of a material false representation we need not determine in this case. ■ It is sufficient for our present purposes to hold that if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class.[9] Defendants may, of course, introduce evidence in rebuttal.

---

[9]The requirement that reliance must be justified in order to support recovery may also be shown on a class basis. If the court finds that a reasonable man would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise. It should be noted in this connection that a misrepresentation may be the basis of fraud if it was a substantial factor in inducing the plaintiff to act and that it need not be the sole cause of damage. (*Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 717 [128 P.2d 522, 141 A.L.R. 1358].) Plaintiffs suggest that individual proof of reliance may be dispensed with if, as they assert, fraud may be presumed from the alleged unconscionable price of the freezers. We need not discuss the merit of this theory since we conclude that if the trial court finds that the alleged misrepresentations were material, it could find an inference or rebuttable presumption of reliance by each class member without his direct testimony.

Some federal class action cases in which stockholders have alleged fraud on the basis of printed misrepresentations in a corporation prospectus hold that individual proof may not be required to establish reliance by each stockholder. (See, e.g., *Green* v. *Wolf Corporation* (2d Cir. 1968) 406 F.2d 291, 301; *Dolgow* v. *Anderson, supra,* 43 F.R.D. 472, 491.)[10]

### c. *Damages*

 The final element of plaintiffs' cause of action is damages. *Daar* makes it clear that although ultimately each class member will be required in some manner to establish his individual damages this circumstance does not preclude the maintenance of the suit as a class action.[11]

### 3. *Summary*

 The complaint alleges there is an ascertainable class and plaintiffs may be able to demonstrate a community of interest as to the elements of their claim of fraud, aside from the amount of damages suffered by each class member. They should, in any event, be afforded the opportunity to demonstrate that proof of most of the important issues as to the named plaintiffs will supply the proof as to all. We conclude, therefore; that the trial court erred in sustaining the demurrers to the first cause of action on the ground that it did not allege a class action.

 It may be, of course, that the trial court will determine in subsequent proceedings that some of the matters bearing on the right to recovery require separate proof by each class member. If this should occur, the applicable rule as stated in *Daar* is that the maintenance of the suit as a class action is not precluded so long as the issues which may be jointly tried, when compared to those requiring separate adjudication, justify the maintenance of the suit as a class action. If the questions which must be litigated separately are not numerous or substantial, it would be advantageous to the parties and the judicial system to allow the named plaintiffs to sue on behalf

---

[10]Beneficial cites *Morris* v. *Burchard* (S.D.N.Y. 1971) 51 F.R.D. 530, in support of its position that individual proof of reliance is required. In *Morris* it was held that the fact of reliance could not be proved on a collective basis because the alleged misrepresentations to the class members were not similar. The present case is distinguishable, because here plaintiffs have alleged a community of interest as to the representations.

[11]Plaintiffs pray for return of the amounts they paid on the contracts, less the value of the food they consumed, a sum of $1,300 or less for most plaintiffs, and not more than $1,700 for any of them. In addition, they seek damages for injury to their credit standing in the community as a result of the outstanding obligation on the contracts and compensation for storing the unused freezers in their homes. These damages are alleged to amount to no more than $1,000 for any one plaintiff. Finally, they ask punitive damages of $5,000 each, alleging that defendants were guilty of oppression, fraud and malice.

of the class.[12] Procedural devices to assist the trial court in making an appropriate determination of these matters will be discussed *infra*.

## IV

### *Defendant's Contentions*

Defendants insist that a class action is inappropriate under these circumstances. It is argued that the present case is distinguishable from *Daar* because there separate suits would have been impractical since the recovery of the individual class members would have been very small whereas in the present case each plaintiff's claim is sufficiently large to justify separate actions.

The complaint alleges that the total obligation of most class members on their contracts is less than $1,300. ■■■ While the impracticability of bringing an individual action for comparatively small potential recovery is a consideration in favor of allowing a class action, it cannot be said that a potential recovery for each class member larger than a nominal sum necessarily militates against maintenance of such a suit. In a recent case we allowed an individual stockholder to sue on behalf of a class although the damages alleged for each member were substantially more than those prayed for in the present case. (See *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 [81 Cal.Rptr. 592, 460 P.2d 464].) We cannot conclude as a matter of law that consumers are entitled to less protection as a class than stockholders.[13]

Several other contentions raised by defendants are based upon policy considerations applicable to consumer class actions generally. It is asserted that a far more effective and efficient remedy for consumers than the class action is the intervention of a governmental body to protect the interests of

---

[12]The character of the issues which must be separately tried varies, of course, from case to case, but each must be tested by the rules set forth above. For example, in *Daar* each class member was required to prove that he rode in a taxicab during the period in issue and that he was overcharged a stated amount, but the total amount of damages to the class as a whole were not difficult to ascertain on a common basis since it was alleged that the exact amount of overcharges was known to the taxicab company and could be ascertained from its books and records.

[13]The United States Supreme Court has interpreted rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.A.) as prohibiting the aggregation of separate and distinct claims to fulfill the $10,000 requirement for federal district court jurisdiction. (*Snyder* v. *Harris* (1969) 394 U.S. 332 [22 L.Ed.2d 319, 89 S.Ct. 1053].) Thus, a class action in the federal courts is not appropriate where the claim of each plaintiff is separate and distinct unless a class member has a claim of $10,000 or more.

consumers,[14] that class actions are invitations to litigation, that they are an unsuitable vehicle in a situation where, as here, the parties have mutual obligations toward one another, and that the real motivation behind such suits is not to benefit the consumer but to punish the wrong-doing seller. Defendants claim judicial efficiency will not be promoted by permitting consumer class actions because no defendant will abide by preliminary determinations of such questions as the composition of the class without prosecuting an appeal since the consequences will be serious in view of the size of the potential judgment. Finally, argue defendants, considerations of practicality and fairness require that a more exacting proceeding than the class action be fashioned to vindicate consumer rights and that the Legislature rather than the courts should devise the remedy.

A two-prong response to the foregoing contentions is manifest. First, *Daar* makes it clear that a consumer class action is an appropriate remedy under section 382 of the Code of Civil Procedure. Second, the Legislature has recently indicated in unmistakable terms that consumers may bring suit as a class to seek redress for damages sustained as a result of false representations by sellers.

While the present case was pending before this court the Legislature enacted the Consumers Legal Remedies Act. (Civ. Code, § 1750 et seq.) The act specifies certain unfair or deceptive practices (§ 1770) and provides that a class action to recover damages may be filed if such practices have caused damage to a number of consumers similarly situated (§ 1781, subd. (a)). The circumstances under which the court may allow the suit to proceed as a class action and the procedure to be followed are also set forth in the act (§ 1781, subds. (b),[15] (c), (d), (e), (f), (g)). Finally, the act requires that before filing suit the consumer shall afford the person alleged to have committed the wrong an opportunity for rectification (§ 1782, subds. (a), (b)).

---

[14]The Attorney General has filed an amicus curiae brief on behalf of plaintiffs in which he asserts that class actions by private litigants are necessary to vindicate the rights of consumers. His office receives 10,000 consumer complaints a year and the Consumer Frauds Division has fewer personnel than the average small law firm engaged in the representation of the sellers of goods. Furthermore, he states, although his office may take legal action in cases of major significance, it cannot undertake to represent private citizens seeking vindication of personal rights.

[15]Section 1781, subdivision (b), provides, "The court shall permit the suit to be maintained on behalf of all members of the represented class if all of the following conditions exist:

"(1) It is impracticable to bring all members of the class before the court.

"(2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members.

"(3) The claims of defenses of the representative plaintiffs are typical of the claims or defenses of the class.

"(4) The representative plaintiffs will fairly and adequately protect the interests of the class."

If a correction is made or will be made within a reasonable time no action for damages will lie (§ 1782, subd. (c)).

Significantly, the act provides in section 1752 that its provisions are not exclusive, that the remedies provided therein shall be in addition to any other procedures or remedies provided for in any other law, and that nothing in the act shall limit any other statutory or any common law rights to bring class actions. However, class actions by consumers brought under section 1770 of the act (which lists certain unlawful deceptive practices) must be brought under the provisions of the act. The statute applies to suits filed on or after January 1, 1971. (§ 1756.)

The Legislature thus made it abundantly clear that consumer class actions allowable under any other provisions of law are not affected by the act. (See Reed, *Consumer Legislation* (1971) 2 Pacific L.J. 1, 9.) We could not possibly hold, in the face of such legislative declaration, that public policy considerations compel refusal to entertain consumers' class actions which may be maintained under other provisions of law. Moreover, the present case arose prior to the effective date of the act and would, therefore, be unaffected by its limitations.

Beneficial contends, however, that the act contains important protective procedures for defendants and that if we hold a consumer class action may be maintained under section 382 of the Code of Civil Procedure without regard to these protective provisions, no plaintiff will choose to sue under the act and submit to its safeguards. Thus, it is claimed, the act would be rendered nugatory.

There is no merit in this contention. As we have seen, the act itself clearly expresses a legislative intent not to affect class actions which may be maintained under other provisions of law. (§ 1752.) There are many types of actions consumers may bring as a class which are not covered by the deceptive practices specified in section 1770. The section is confined largely to deceptive representations; a case like *Daar*, involving overcharges by a taxicab company by means of inflated readings on a meter, would not readily fall within the statutory provisions. As to those cases in which the complaints were filed prior to the effective date of the act and those which do not involve practices described by section 1770, a plaintiff need not follow the protective procedures prescribed in section 1782 et seq. However, if a class action is filed after January 1, 1971, the effective date of the act, and it alleges conduct described in section 1770, the procedures specified in the act must be utilized. Such interpretation of the statute gives effect to the dual mandate that the provisions of the act are not exclusive and do not affect other statutory and common law rights to bring class

actions, but that class actions brought for redress against the specified deceptive practices and filed hereafter must be governed exclusively by the provisions of the act.

The parties and amicus curiae cite numerous cases in support of their respective positions. These authorities are of limited usefulness because their facts are markedly dissimilar to those alleged here. Most of the decisions involved problems discussed in *Daar,* the principles of which we deem controlling.

*Weaver* v. *Pasadena Tournament of Roses* (1948) 32 Cal.2d 833 [198 P.2d 514], distinguished in *Daar,* held that a class action could not be maintained because each plaintiff would be required to prove too many factors relating to his own case. There was, said the court, no community of interest among the class members.

*Slakey Brothers Sacramento, Inc.* v. *Parker* (1968) 265 Cal.App.2d 204 [71 Cal.Rptr. 269], was a class action for fraud by some of the creditors of an insolvent subdivider suing on behalf of themselves and other creditors. It was alleged that defendants concealed the subdivider's financial peril, causing plaintiffs to refrain from attempts to collect their debts. The alleged misrepresentations were in form and mode of communication so varied as to "exhaust the legal possibilities"; some of them were made to the purported class as a group, others only to some, still others to public officers. It was held that proof that misrepresentations reached each creditor was required and that the reliance of each creditor upon the misrepresentations which reached him would have to be shown individually.[16]

Decisions from other jurisdictions do not reveal a consistent pattern. A few cases permitted class actions in situations in which there were considerable variations in the facts relevant to each member of the class. (E.g., *Contract Buyers League* v. *F & F Investment* (N.D.Ill. 1969) 48 F.R.D. 7 [class action by numerous Negro purchasers of real property against sellers for alleged fraud and violations of civil rights in the sale of property].) On the other hand, defendants cite decisions in which class actions were barred even though there was substantial commonality in the facts applicable to each class member. (E.g., *Hall* v. *Coburn Corporation of America* (1970) 26 N.Y.2d 396 [311 N.Y.S.2d 281, 259 N.E.2d 720] [violations of

---

[16]*Slakey Brothers* declares "Knowledge and reliance are subjective elements, requiring direct or circumstantial proof of state of mind." It goes on to state, with commendable prescience, "Conceivably, collective reliance by all members of a group could be proved circumstantially, through evidence that its members responded collectively to a directly communicated falsehood. . . . The fact that no California decision has yet sustained a representative suit for collective deceit does not, of course, mean that such a suit will never be sustained." (265 Cal.App.2d at pp. 208, 209 fn. 3.)

New York state credit law because of size of type used in installment sales contracts].)[17]

## V

### Procedure

If the class action is to prove a useful tool to the litigants and the court, pragmatic procedural devices will be required to simplify the potentially complex litigation while at the same time protecting the rights of all the parties. Although we have concluded that the provisions of the Consumers Legal Remedies Act do not apply retroactively to this case, no valid reason exists to prevent the trial court from utilizing many of the procedural provisions of the act in the interests of efficiency.

Section 1781, subdivision (c), of the Civil Code provides for a hearing, upon notice and motion, supported by affidavits, to determine if a class action is proper, whether published notice to the class members is necessary, and whether the action is without merit or whether there is a defense to the action. Subdivision (d) of that section provides that if the cause is to be permitted as a class action the court may direct either party to notify each class member and subdivision (e) sets forth the requirements of such notice, including a statement that the court will exclude the member notified from the class if he so requests by a specified date. Subdivision (f) prohibits settlement of a class action without approval of the court and notice to the class members, and subdivision (g) specifies the manner in which notice of the judgment must be given and provides that the judgment must state the names of the class members.

Although we have determined that the trial court acted improperly in sustaining the demurrers to the first cause of action as a class action because plaintiffs may be able to demonstrate a community of interest as to the elements of their claims of fraud, plaintiffs must nevertheless demonstrate that the questions which they will be required to litigate separately are not numerous or substantial and that the action meets the other requirements for a class action set forth in detail above. It would be appropriate

---

[17]Defendants rely upon a statement in a 1938 annotation in American Law Reports that "Class or representative suits to obtain the rescission of transactions based on similar frauds practiced by one defendant upon various, and commonly numerous, persons, have so often been held not maintainable that one may well doubt whether under any circumstances such a suit will lie." (114 A.L.R. 1015 at p. 1016.) This 33-year-old categorical pronouncement is anachronistic in view of the numerous federal cases permitting class actions in securities fraud cases as well as other authorities cited above.

for the trial court to utilize the hearing procedure specified in subdivision (c) of section 1781 in making such a determination.

The technique described in the act may not adequately encompass all the procedural problems facing a court in the trial of a class action. In the event of a hiatus, rule 23 of the Federal Rules of Civil Procedure prescribes procedural devices which a trial court may find useful. (Cf. *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 709.) It is desirable for the trial court to retain some measure of flexibility in the pretrial and trial of a class action, for conceivably even after an initial determination of the propriety of such an action the trial court may discover subsequently that it is not appropriate. For example, it is possible that, after notice to the class members, the court might find that an insufficient number of the class desires to participate in the suit to justify its maintenance as a class action and may determine that joinder or some other procedural device would be a more suitable method of proceeding. Subdivision (c)(1) of rule 23 provides that the trial court's initial determination may be conditional and may be altered or amended before a decision on the merits. As another example, it is possible that the court will find that efficiency would be promoted if the class were divided into subclasses. Subdivision (4)(B) of rule 23 contemplates such a procedure.

The foregoing examples are intended to be illustrative and not exhaustive. As pointed out in the preface to California Retail Installment Sales (Cont. Ed.Bar 1969) page vii, "Much of the law in this field is in the formative stage. . . ." Therefore we must rely upon the ability of trial courts to adopt innovative procedures which will be fair to the litigants and expedient in serving the judicial process.

## VI

### *Liability of Finance Company Defendants*

The final question is whether the finance company defendants to which the sales contracts were assigned are proper parties defendant in the action.[18] In the instant case, as in many situations in which consumers have been defrauded by a seller, a judgment against the seller alone would

---

[18]Strictly speaking, it is not necessary to decide the question at this time. The trial court has concluded, at least for the purpose of ruling on the demurrers, that the finance companies are proper parties defendant since it overruled their demurrers to the fraud cause of action insofar as the individual plaintiffs are concerned. However, the issue has been briefed extensively, the question of the finance company defendants' liability will undoubtedly arise at the trial, and we discuss the matter here in order to guide the trial court in its conduct of the action.

represent a Pyrrhic victory because the defrauding seller is insolvent and the victorious consumers remain liable to the finance companies, which as the assignees of the installment contracts claim that they are entitled to payment even if the seller acted fraudulently. Bay Area merely filed a demurrer and answer in the trial court and has indicated no inclination to oppose the action further. Obviously, if plaintiffs are to be made whole for the wrongs allegedly done to them, the finance company defendants must be held liable as assignees if Bay Area is culpable.

The lenders contend, however, that even if plaintiffs prove that Bay Area was guilty of fraud they are nevertheless entitled as assignees to payment under the contracts because they enjoy the privileges of a holder in due course and take free of plaintiffs' defenses against Bay Area. Although it is not entirely clear from the record, this claim apparently rests on a clause in the contracts signed by plaintiffs waiving all defenses against assignees.[19]

It seems clear under both statute and established legal principles that the finance company defendants would not be deemed holders in due course under the allegations of the complaint, even if they were holding an ordinary promissory note. The complaint alleges that Avco, Sterling and Beneficial had actual or constructive knowledge of Bay Area's fraudulent practices. Under section 3302, subdivision (1)(c), of the Commercial Code, one who takes with notice of a defense against an instrument is not a holder in due course. (See *Norman* v. *World Wide Distributors, Inc.* (1963) 202 Pa.Super. 53 [195 A.2d 115, 118].)

 Moreover, it has long been settled in California that a financial institution may be denied the status of a holder in due course because of its close connection with the seller. (*Coml. Credit Corp.* v. *Orange Co. Mach. Works* (1950) 34 Cal.2d 766 [214 P.2d 819]; see *Morgan* v. *Reasor Corp.* (1968) 69 Cal.2d 881, 895 [73 Cal.Rptr. 398, 447 P.2d 638].)[20] In *Commercial Credit* we held that since the assignee of a contract and note advanced money to the seller with the understanding that these instruments would be assigned to it, supplied the contract forms to the seller, and actively participated in the transaction from its inception, it could not claim holder-in-due-course status. The complaint in the present case con-

---

[19]The Unruh Act prohibits the execution of a note by a buyer which will when separately negotiated cut off as to third parties any right of action or defense which the buyer may have against the seller. (Civ. Code, § 1810.9.)

[20]Avco claims that *Morgan* was overruled by the enactment of section 1801.4 of the Civil Code in 1969. (Stats. 1969, ch. 554, § 1.) Section 1801.4, a provision of the Unruh Act, merely states that the act does not apply to any contract for the construction and/or sale of a residence or commercial building or for the sale of real property.

tains allegations aimed at bringing the finance companies within these principles.[21]

 Under section 9206 of the Commercial Code, a clause in a contract waiving defenses against an assignee is only effective when the assignee takes in good faith and without notice of defenses and not even then as to such defenses as may be raised against a holder in due course. The section provides, however, that it is subject to any statute which establishes a "different rule" for buyers of consumer goods.

We must next inquire whether a "different rule" is set forth in section 1804.2 of the Civil Code, which is a provision of the Unruh Act. The section provides, "Except as provided in Section 1812.7,[22] an assignee of the seller's rights is subject to all claims and defenses of the buyer against the seller arising out of the sale notwithstanding an agreement to the contrary, but the assignee's liability may not exceed the amount of the debt owing to the assignee at the time that the defense is asserted against the assignee. The rights of the buyer under this section can only be asserted as a matter of defense to a claim by the assignee."

The finance companies contend that under this section plaintiffs may not bring an affirmative action against them for rescission but may only assert their defense of fraud in an action by the finance companies to collect on the contracts and then only to the extent of the amount still owing. Upon analysis, however, a number of considerations militate against such a restrictive interpretation of the section as to assignees who take with notice of defenses against an instrument or who bring themselves within the rationale of *Commercial Credit*.

 The purpose of the Unruh Act is to protect consumers, and it should be liberally construed to that end. (*Morgan* v. *Reasor Corp., supra*, 69 Cal.2d 881, 889.) If we were to adopt the concept of the finance companies it would, by virtue of section 1804.2, bestow upon them immunities and privileges against consumers unavailable to them in the ordinary com-

[21]It is alleged that Bay Area followed a regular business practice of assigning to Avco substantially all of its contracts in San Joaquin and Stanislaus Counties, of assigning all poor credit risks to Sterling, and a "substantial number" of contracts to Beneficial. Moreover, it is alleged, Bay Area was the agent of these lenders and used contract forms supplied by Avco.

[22]Section 1812.7 of the Civil Code provides: "In case of failure by any person to comply with the provisions of this chapter, such person or any person who acquires a contract or installment account with knowledge of such noncompliance is barred from recovery of any finance charge or of any delinquency, collection, extension, deferral or refinance charge imposed in connection with such contract or installment account and the buyer shall have the right to recover from such person an amount equal to any of such charges paid by the buyer."

mercial transaction. (Cf. *Unico* v. *Owen* (1967) 50 N.J. 101 [232 A.2d 405, 417-418].)

It is suggested by amicus curiae that section 1804.2 was intended to eliminate the possibility that by depriving assignees of any right to take free of the buyer's defenses against the seller despite an agreement to the contrary, the section might subject assignees to products liability suits which might involve personal injuries and large damage claims.[23]

It would be ironic indeed if a provision in an act intended to benefit consumers could be invoked to their detriment to such an extent that they would stand in a less advantageous position than others in the commercial arena. (See Consumer Viewpoints: Critique of the Uniform Consumer Credit Code, vols. 1, 2, p. 445.) ■ We are constrained to conclude that the limitations on a buyer's rights set forth in section 1804.2 are not applicable if an assignee has taken the contract with notice of defenses of the buyer against the assignor or if the assignee's relationship with the assignor comes within the rule set forth in *Commercial Credit*.

The finance companies advance numerous policy arguments in support of their claim that they should not be held liable for Bay Area's alleged fraud. It is asserted that a finance company is in no position to police the seller's activities, cannot know whether the goods which are the subject of the contract are reasonably priced, and should not be required to make such a determination. Moreover, if the finance company takes too active a part in the seller's business he becomes subject to liability under the *Commercial Credit* doctrine. Financial institutions are also victimized by fraudulent sellers and they have strong incentive to refrain from tacitly participating in a seller's fraud.

It must be emphasized that the complaint alleges the finance company defendants were aware of Bay Area's fraud and under the law one who accepts an instrument with notice of a defense against it is not a holder in due course. If, despite the allegations of the complaint—admittedly true on demurrer—we were to adopt the views of the finance companies, we would be according to financial institutions greater commercial advantage

---

[23]The section is taken from the Uniform Consumer Credit Code (§ 2.404, Alternative A), which model legislation has not been adopted in this state. The coreporter-draftsman of this code, who assisted in the preparation of an amicus curiae brief, asserts that he actively participated in the discussions of the commissioners in the drafting of the section, that their concern was to avoid product liability claims against assignees, and that there was no discussion of the possibility that the provision could deprive a buyer of his right to bring an action to rescind a contract fraudulently induced.

against consumers than they enjoy with reference to all others.[24] Such a result cannot be justified.[25]

As far back as 1953, the Florida Supreme Court warned that the burden on finance companies may "require some changes in business methods." But, said the court, "the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers." (*Mutual Finance Co.* v. *Martin* (Fla. 1953) 63 So.2d 649, 653 [44 A.L.R.2d 1].) Zeal is originally employed by the seller in investigating the credit of the buyer; only a modicum of additional zeal by the lender should be necessary to investigate the good faith of the seller. If any hardship results from the rule we adopt, it is only that hardship inherent in the insistence of the law that honesty and enterprise must remain compatible.

The writ is granted, and the trial court is directed to vacate its judgment dismissing the first cause of action as a class action, to vacate its order sustaining the demurrers without leave to amend, to overrule the demurrers, and to proceed in a manner consistent with the views expressed herein.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[24]The Attorney General as amicus curiae urges that consumer installment contracts should not, for reasons of public policy, be viewed as negotiable instruments. The question whether lenders purchasing installment contracts should be deemed holders in due course has been vigorously debated in the law reviews. (See, e.g., Jordan and Warren, *Uniform Consumer Credit Code* (1968) 68 Colum.L.Rev. 387, 436; Murphy, *U3C and Negotiability* (1968) 29 Ohio St.L.J. 667; Note (1970) 55 Cornell L.Q. 611.) We need not discuss this problem in view of our conclusion that the finance company defendants may not in any event be deemed holders in due course under the allegations of the complaint.

[25]Defendants also contend that serious unfavorable consequences for consumers would ensue if lenders are held liable for the seller's fraud. It is claimed that lenders would be required to insure themselves against the risk of being deprived of holder-in-due-course status and would do so by accepting contracts from only the most select sellers, thus depriving the buyer of a competitive market, that sellers would receive less money for the contracts assigned to lenders, and the lower return would be reflected in higher price to consumers. These arguments were rejected in *Morgan* with regard to a somewhat analogous matter. (*Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881 at p. 890.)